**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**
No. 93-2211

In the Matter of:
APPLETREE MARKETS, INC., et al.,

                                        Debtors.


SOUTH CENTRAL UNITED FOOD &
COMMERCIAL WORKERS UNIONS AND
EMPLOYERS HEALTH & WELFARE TRUST, et al.,

                                        Appellants,


VERSUS

APPLETREE MARKETS, INC.,

                                        Appellee.


_____

Appeal from the United States District Court
for the Southern District of Texas
_____
(April 15, 1994)


Before VAN GRAAFEILAND[*], SMITH, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

There is only one issue in this case:  When an employer with-draws from a multi-employer health insurance plan and establishes a new health plan for its remaining employees, who must continue to provide the health insurance mandated by COBRA to the qualifying

_____

[*] Circuit Judge of the Second Circuit, sitting by designation.

employees of the withdrawing employer?  The district court held that the multi-employer plan remains responsible for the COBRA-qualified employees.  Finding this conclusion consistent with the plain language of the statute and coherent policy goals, we affirm.

I.

This matter involves an issue of first impression concerning coverage under the Consolidated Omnibus Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1161 et seq. ("COBRA").[1]  The issue was submitted to the district court on cross-motions for summary judgment on an uncontroverted record.  Accordingly the facts set forth below are undisputed.

Defendant-appellee AppleTree Markets, Inc. ("AppleTree"), a supermarket chain, is an employer that, pursuant to a collective bargaining agreement, provided health benefits to its employees through plaintiff, a multi-employer health plan known as South Central United Food & Commercial Workers Unions and Employers Health & Welfare Trust ("UFCW").  UFCW is a multi-employer employee welfare benefit plan for the purposes of ERISA, 29 U.S.C. § 1002(1), providing health and medical benefits to employees in the retail food industry.  UFCW is funded through contributions from participating employers; AppleTree became a participating employer in the plan in June 1988 and thereafter contributed to UFCW monthly.

---

[1] Although COBRA is referred to by its own name, it is technically a set of amendments to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

In January 1992, AppleTree filed for bankruptcy under chapter 11 of the Bankruptcy Code. In the course of its bankruptcy proceedings, AppleTree obtained court approval to shed its collective bargaining agreements. As a result of the termination of the agreements, UFCW withdrew AppleTree's membership in the plan when no agreement could be reached on AppleTree's prospective contribution rate to the plan.

AppleTree established its own group health plan as of September 1, 1992, covering only employees active at that time but not its former employees receiving coverage from UFCW under COBRA. In other words, AppleTree withdrew its active employees from the UFCW plan but left behind its COBRA insureds.

UFCW sued, claiming that AppleTree had an obligation under COBRA to extend coverage under its new plan to its former employees now receiving benefits from UFCW under COBRA. AppleTree contended that UFCW was obligated to extend the COBRA benefits. Neither party disputes that the former employees are entitled to COBRA benefits: The disagreement is whether UFCW or AppleTree should provide it.

Relying upon the plain language of COBRA, the district court granted summary judgment to AppleTree, holding that § 29 U.S.C. § 1161(a) defines UFCW as the sponsor of the plan that therefore is responsible for the coverage. We affirm.

II.

We review a grant of summary judgment de novo. Hanks v.

3

<u>Transcontinental Gas Pipe Line Corp.</u>, 953 F.2d 996, 997 (5th Cir. 1992). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Here, our task is made simpler because the facts are undisputed and we deal almost exclusively with a question of statutory interpretation.

III.

A.

Section 1161(a) reads as follows:

> The plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying even is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.

Thus, the plan sponsor of a group health plan must offer continuation coverage to employees, their spouses, and dependents who become qualified for such coverage while covered by the plan, and that coverage is to be provided under the plan in which the beneficiary participated at the time the qualifying event[2] occurred. <u>See</u> <u>id.</u>; 29 U.S.C. § 1167.

COBRA defines the "plan sponsor" as

(i) the employer in the case of an employee benefit plan

---

[2] "Qualifying events" include, among other things, the death, termination, or divorce of a covered employee. <u>See</u> 29 U.S.C. § 1163.

4

> established or maintained by a single employer, . . . or (iii) in the case of a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organizations, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan.

29 U.S.C. § 1002(16)(B).  The UFCW plan was a multi-employer, "joint" plan.  Under the plain language of the statute, the "association, committee, joint board, or other similar group of representatives" of UFCW is the plan sponsor.  Therefore, under § 1161(a), UFCW, not AppleTree, is responsible for providing continuation coverage to the COBRA employees.

Once the statutory relationship is established, it can be terminated only for one of the reasons enumerated in 29 U.S.C. § 1162(2).  UFCW has not alleged that any of the events listed in § 1162(2) has occurred; therefore, there is no legal basis for UFCW to terminate coverage of these COBRA employees.

### B.

### 1.

UFCW contends, however, that this case is controlled by 29 U.S.C. § 1162(1), defining "continuation coverage," and not by § 1161(a).  Section 1162(1) provides:

> The coverage must consist of coverage which, as of the time the coverage is being provided, is identical to the coverage provided under the plan to similarly situated beneficiaries under the plan with respect to whom a qualifying even has not occurred.  If coverage is modified under the plan for any group of similarly situated beneficiaries, such coverage shall also be modified in the same manner for all individuals who are qualified beneficiaries under the plan pursuant to this part in connection with such group.

UFCW claims that § 1162(1) requires an employer that modifies health coverage for its employees by transferring them from one plan to another, but does not terminate all of its health plans, to transfer coverage for all COBRA-qualified beneficiaries as well. According to UFCW, "similarly situated beneficiaries" are AppleTree's active employees and their dependents who have not experienced a COBRA-qualifying event. Further, when the active employees' "coverage" was "modified," the COBRA beneficiaries coverage must be changed identically.

UFCW's reading of the statute is strained and insupportable by the language of § 1162(1). A natural reading of § 1162(1) reveals an intent to forbid plan sponsors from discriminating between COBRA and active employees within a given plan.

There is no support for UFCW's position that a discrete movement from one plan to another can qualify as a modification of coverage under the original plan. The statute refers to a modification of coverage under the plan. This implication that the statute is intended to prevent discrimination within a single plan cannot reasonably be read to extend to those participating in a separate plan.

Thus, § 1162(1) does not apply to this case and would become relevant only if UFCW modified coverage to active employees participating in its plan. If so, § 1162(1) would require it to modify similarly the benefits of beneficiaries of continuation coverage. Nothing in § 1162(1) requires an entity that has never previously sponsored health care coverage for an individual to

6

provide continuation coverage to him simply because it later gives coverage to others.

2.

UFCW relies upon proposed Treasury Department regulations to buttress its claim that "modification" includes elimination of coverage for similarly situated employees. The authority of proposed regulations has not been addressed by this circuit.

UFCW relies upon district court opinions holding that proposed regulations are entitled to "great judicial deference." See Swint v. Protective Life Ins. Co., 779 F. Supp. 532, 554 (S.D. Ala. 1991); Johnson v. Reserve Life Ins. Co., 765 F. Supp. 1478, 1480-82 (C.D. Cal. 1991). AppleTree argues that a proposed regulation has no force or effect until it becomes final. See Oakley v. City of Longmont, 890 F.2d 1128, 1133 (10th Cir. 1989), cert. denied, 494 U.S. 1082 (1990). Thus, proposed regulations are not entitled to judicial deference and carry no more weight than a position advanced in a brief by one of the parties. See Natomas N. Am., Inc. v. Commissioner, 90 T.C. 710, 718 n.11 (1988); F.W. Woolworth Co. v. Commissioner, 54 T.C. 1233, 1265-1266 (1970). We agree with AppleTree and hold that proposed regulations are entitled to no deference until final.

Our view accords with other circuits that have considered the question. In Oakley, 890 F.2d at 1133, the Tenth Circuit noted that "[u]ntil the agency completes formal rule-making and promulgates final regulations, the proposed rules, which the

7

Internal Revenue Service has already deemed interpretive regulations, are unpersuasive."  Similarly, when presented with proposed regulations from the Securities and Exchange Commission, the Fourth Circuit refused to consider their effect, noting that the "regulations are not in effect and we do not know when, if ever, they will become effective."  Telvest, Inc. v. Bradshaw, 618 F.2d 1029, 1036 n.10 (4th Cir. 1980).

To give effect to regulations that have merely been proposed would upset the balance of powers among the constitutional branches.  Deference is due the Executive when Congress delegates "authority to the agency to elucidate a specific provision of the statute by regulation.  Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843-44 (1984) (emphasis added).

The Chevron doctrine is based upon separation of powers:  As Justice Stevens's use of the term "legislative regulations" suggests, Congress is delegating to the Executive Branch authority to act in an essentially legislative manner to fill the interstices of the statute.  "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."  Id. at 843 (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).

In effect, statutory ambiguity cedes legislative authority to

8

the Executive. The Executive Branch need not promulgate rules that best mirror legislative intent; its rules only need not be arbitrary or capricious. Absent executive rulemaking, it remains the duty of courts to construe the statute in order to divine congressional intent. In other words, if final executive regulations interpreting an ambiguous statute are promulgated, then the Executive is the "gap-filling" institution; if there is no authoritative statement from the Executive, the courts "fill the gap" by attempting to divine congressional intent.

Once it is recognized that Executive rulemaking is actually interstitial legislation, it becomes inappropriate to defer to proposed regulations, as that would upset the constitutional balance of power among the branches in the same manner as would deference to laws considered but not enacted by Congress.

## C.

UFCW argues that by contributing to the plan, AppleTree "established and maintained" the plan within the language of 29 U.S.C. § 1002(16)(B). Thus, when AppleTree quit contributing to the plan, UFCW no longer was the plan sponsor as to these individuals. Under this reading, the plan sponsor changes as members enter and exit the plan. The statute indicates, however, that multi-employer plans have only one sponsor, the joint board of trustees. Membership changes in the plan do not affect this definitional fact.

Furthermore, once the UFCW board became the plan sponsor, it

9

could not be relieved of this duty until the occurrence of an event listed in § 1162(2).  UFCW admits that it was the plan sponsor for at least the time that AppleTree contributed to the plan; from then on it remained the plan sponsor, as nothing in § 1162(2) permits a plan sponsor of a multi-employer plan to terminate its COBRA obligation to qualified individuals because a participating employer subsequently sponsors its own plan for other covered persons.

IV.

UFCW contends that adopting AppleTree's reading of the statute would lead to an inequitable result and therefore should be eschewed.  UFCW argues that allowing AppleTree to relieve itself of responsibility for the COBRA beneficiaries would create an "adverse selection" problem allowing AppleTree to foist poor-risk COBRA beneficiaries onto the plan, while retaining the good risks in its new plan.

An adverse selection problem arises because even though the COBRA beneficiaries continue to pay premiums, the amount they can be charged is limited by law.  Moreover, the plan cannot condition the availability of COBRA coverage on evidence of insurability.  See 29 U.S.C. § 1162(4); 26 U.S.C. § 4980B(f)(2)C).  As a result, "Former employees choose continuation coverage only when that is cheaper than insurance at market prices." Herrmann v. Cencom Cable Assocs., 978 F.2d 978, 979 (7th Cir. 1992).  "[F]ormer employees would like to treat continuation coverage as an option, to be

10

exercised only if they are sure that they face medical costs exceeding the premiums. If they turn out to be healthy, they do not enroll and pay nothing. If medical needs loom, they exercise their option." Id. Because COBRA-qualified beneficiaries rationally will elect coverage only if their premiums will be less than their benefits, the remaining members of the plan subsidize their benefits. In turn, employers would prefer to provide coverage only for good risks, rather than subsidizing the COBRA-qualified bad risks as well.

Allowing AppleTree to abandon coverage of its COBRA-qualified ex-employees allows it to bring only the good risks within its new plan, while leaving the bad risks in the UFCW plan. UFCW contends that this result is inequitable and contrary to congressional intent. UFCW claims that it is more equitable to require AppleTree to subsidize its poor risks, rather than having the remaining plan members subsidize them. Thus, we should ignore the plain language of the statute and force AppleTree to cover the COBRA beneficiaries.

We reject the UFCW's argument for two reasons. First, to ignore the plain language of the statute would be to substitute improperly our own policy predilections for the express intent of Congress. Second, coherent and sensible policies undergird the plain language of the statute.

A.

The allegedly inequitable result the plain language of

11

§ 1161(a) commands results from Congress's caps on rates and its forbidding conditioning of availability on evidence of insurability, not from the statutory definition of "plan sponsor." If the plan could charge the market price for insuring these high-risk individuals, there would be no adverse selection problem.

UFCW would have us accept the price caps as given and define the term "plan sponsor" to account for the side-effects of the caps. We could as easily accept § 1161(a)'s definition of plan sponsor, and then declare the price caps invalid as inequitable. There is no more ground for ignoring the statutory definition of "plan sponsor" than for ignoring the rate caps or the ban on evidence of insurability.

UFCW has cited no evidence that Congress was aware that its price regulation created an adverse selection process or that Congress intended to rectify the problem by requiring courts deliberately to misread § 1161(a). We can avoid the unintended consequences spawned by COBRA's price caps only be eviscerating § 1161(a). Correcting the ill effects of price caps by choosing which provisions in ERISA's "complex and highly technical regulatory program"[3] will be given effect is the duty of Congress, not the judiciary. Such a course invites us to substitute our policy preferences for those reflected in the language of the statute. We reject this invitation and construe § 1161(a) according to its plain meaning.

---

[3] Meredith v. Time Ins. Co., 980 F.2d 352, 357 (5th Cir. 1993).

12

B.

If we examine the policies underlying the statutory language, we must reject UFCW's classification of them as absurd or inequitable. Multi-employer benefit plans such as UFCW are concerned that participants such as AppleTree will exit the plan, leaving the high risk employees behind. But the coverage agreement between the employer and the plan is a voluntarily-bargained document; thus, the agreement can provide for this concern. Since all elements of the agreement between the plan and an employer are freely negotiated at the time of joining the plan, the parties can allocate this risk.

Indeed, establishing actuarial risk is easier as the size of the participant pool grows. Thus, there are strong countervailing forces providing AppleTree with incentives to remain in the program. For smaller employees, these pressures to remain in a multi-employer plan are even stronger. In fact, multi-employer plans can refuse to admit prospective members who are unable to pay their way.

The statutory solution to a loss of revenue because of a withdrawal of participants is not to terminate coverage for some, as UFCW attempted to do here. Rather, if revenue falls because of defections, § 1162(1) requires the joint board to change coverage for all participants, not to terminate coverage for some while retaining full coverage for others.

Finally, we reject UFCW's premise that it is somehow more "equitable" for AppleTree than for the other UFCW plan members to

13

subsidize coverage for the COBRA beneficiaries.  When UFCW became the plan sponsor, it assumed responsibility for these beneficiaries.  It is not inequitable to hold it to its statutory responsibilities.

V.

Giving the statutory language its plain meaning and construing it in light of reasonable congressional policy goals, we conclude that AppleTree is entitled to judgment as a matter of law. Therefore, we AFFIRM the district court's grant of summary judgment.

14

JACQUES L. WIENER, Jr., Circuit Judge, specially concurring.

I fully recognize that, inasmuch as I am concurring in Judge Smith's typically well-crafted opinion for the panel in this case, affirming the equally well-crafted opinion of the district court, I run the risk of gilding the proverbial lily when I write separately. I do so nonetheless in the hope of adding a bit of perspective to the situation and thereby bolstering further this court's position in the instant appeal. I am satisfied that when the instant case is viewed in the framework of the purposes for which multiemployer plans are created, the types of workers and types of industries which such plans are generally intended to serve, and certain overarching features of ERISA, such as its "Type of Benefit Coverage" provision and its "Written Instrument" requirement, our ruling today will be seen not solely as the product of a fair reading of the plain language of the statute "in a vacuum," but more broadly as a fair and sensible determination that is wholly consistent with the goals and purposes of ERISA in general and multiemployer plans in particular.

I

PLAIN LANGUAGE REVISITED

First, I would re-emphasize the point that ERISA's "Type of Benefit Coverage" provision does not require AppleTree as an employer participating in a multiemployer welfare benefit plan, to provide COBRA benefits to those of AppleTree's former employees and their dependents who had been receiving, or became eligible to receive, COBRA coverage under the UFCW prior to September 1, 1992

("SCP Qualified Beneficiaries"). Section 602(1) of ERISA[4] provides:

> (1) The coverage must consist of coverage which, as of the time the coverage is being provided, is identical to the coverage provided <u>under the plan</u> to similarly situated beneficiaries <u>under the plan</u> with respect to whom a qualifying event has not occurred. If coverage is modified <u>under the plan</u> for any group of similarly situated beneficiaries, such coverage shall also be modified in the same manner for all individuals who are qualified beneficiaries <u>under the plan</u> pursuant to this part in connection with such group.[5]

In applying § 602(1) to the instant case, UFCW's joint board (the "Board")SQthe designated plan sponsorSQinterprets the term "similarly situated beneficiaries under the plan for whom a qualifying event has not occurred" to mean AppleTree's employees. But the Board's interpretation ignores the unambiguous wording of the statute which specifies that similarly situated beneficiaries are those beneficiaries who are participating <u>in the same plan</u> as the COBRA qualified beneficiaries.

Section 602(1) describes the "type of benefit coverage" to be provided to COBRA qualified beneficiaries under a plan. Specifically, § 602(1) requires the plan sponsor to provide identical health care coverage to the COBRA qualified beneficiaries of the plan as is provided to other persons who are "similarly situated" to them <u>and</u> who are participating in the <u>same plan</u>. To achieve this objective, § 602(1) also requires that if the <u>plan</u>

---

[4] 29 U.S.C. § 1162(1).

[5] <u>Id.</u> (emphasis added).

16

sponsor modifies coverage for such "similarly situated" persons, it must also modify the coverage for COBRA qualified beneficiaries in the same manner. Correctly applying the above quoted language of the statute, no support can be discerned for the Board's interpretation that individuals become "similarly situated" to COBRA qualified beneficiaries of one plan when the individuals participate in another plan. Instead, the language of § 602(1) demonstrates that the intent of Congress was to prohibit plan sponsors from discriminating between COBRA qualified beneficiaries and active employees who are participating in the same plan.

Further, the plain language of the statute does not support the Board's contention that AppleTreeSQa formerly participating employerSQsomehow caused a modification of the coverage within the meaning of § 602(1) when it sponsored its own group health plan for its employees after the SCP Qualified Beneficiaries became eligible for and began to receive COBRA coverage under the UFCW. The statute refers to a modification of coverage under the same plan. The language of § 602(1) reflects that the intent of Congress was to prohibit a plan sponsor from modifying coverage to provide coverage to COBRA qualified beneficiaries different from the coverage provided to "similarly situated" active employees of the same plan. Nothing in § 602(1) requires an entity that has never sponsored health care coverage for an individual to provide COBRA benefits for that individual simply because the entity happened to have been his employer when he experienced a COBRA qualifying event under a multiemployer plan and the entity subsequently establishes

17

a group health plan for its own employees.  The majority opinion makes this abundantly clear.

To reach a different conclusion would not only ignore the plain language of the statute but would also fail to recognize the purpose and structure of multiemployer plans.

The primary purpose of multiemployer plans is to provide benefits to workers of a particular industry or area.  Through this structure, the workers are able to continue their coverage under the plan despite moving from one employer to anotherSQa phenomenon typical of certain industries, including retail food sales and serviceSQwithin the group of employers participating in the plan. To terminate an individual's COBRA coverage under a multiemployer plan just because he happened to work for one particular employer among the many at the time he became eligible to receive COBRA benefits under the plan would fly in the face of a principal purpose of multiemployer plans.  More about this later.

Applying the foregoing principles, § 602(1) would be applicable in the instant case ifSQbut only ifSQthe Board modified the coverage of the active employees and their dependents who are participating in the UFCW and who are <u>similarly situated</u> beneficiaries with respect to the SCP Qualified Beneficiaries.  Here, no such modification of coverage occurred.  Accordingly, § 602(1) is inapplicable and does not relieve the Board of its obligation to provide COBRA coverage to the SCP Qualified Beneficiaries; neither can § 602(1) be stretched to shift such obligation to AppleTree.

II

18

DEFINITION OF PLAN SPONSOR

ERISA's "definition of plan sponsor" actually prohibits AppleTree from replacing the Board as plan sponsor of the SCP Qualified Beneficiaries, absent some express written provision to that effect in the UFCW or its plan documents. Nevertheless, as amicus, the National Coordinating Committee for Multiemployer Plans ("NCCMP") insists, on behalf of the Board, that AppleTree was required to relieve the Board of its COBRA obligations on August 31, 1992. I disagree.

Recognizing as it must that COBRA requires the "plan sponsor" to provide COBRA coverage, NCCMP proceeds to argue that AppleTree "established and maintained" the UFCW by making contributions thereto; and that as a result when AppleTree ceased contributing to the UFCW and established a group health plan for its employees on September 1, 1992, the Board ceased to be the plan sponsor as to AppleTree's former and active employees, and the duty of providing COBRA benefits reverted to AppleTree as plan sponsor of those individuals on that date. On the basis of that bit of legal legerdemain, NCCMP concludes that AppleTree is the party responsible for providing the SCP Qualified Beneficiaries with COBRA coverage as of September 1, 1992.

This contention, however, finds no support in the statute, the plan documents, or reality. ERISA provides the specific statutory definition of "plan sponsor": Multiemployer plans have only one plan sponsor, the joint board of trustees. Changes in the identity of employers who from time to time participate in the plan have no

19

effect on the party designated by ERISA to be the "plan sponsor." The joint board of trustees remains the "plan sponsor" regardless of which employers are permitted to withdraw from (or join) the plan.

## III

## THE MULTIEMPLOYER PENSION PLAN AMENDMENT ACT - A COMPARISON

Indirect but strong support for the conclusion that withdrawal of an employer from a multiemployer welfare benefit plan does not change the party designated as plan sponsor is found in the adoption by Congress of the Multiemployer Pension Plan Amendment Act of 1980 ("MPPA"). Congress enacted the MPPA in response to concerns about the extreme financial hardships of multiemployer pension plans (as distinguished from multiemployer welfare benefit plans) and the resulting potential liability of the Pension Benefit Guaranty Corporation to pay for certain unfunded pension benefits. These concerns arose because of the tension between the plan sponsors on the one hand and the contributing employers of multiemployer pension plans on the otherSQtension resulting from the disparate identities and interests of those parties.

In response to those concerns, Congress elected not to redesignate the plan sponsor of a multiemployer pension plan upon the withdrawal therefrom of an employer. Instead, the legislative solution was to impose withdrawal liability on an employer who withdraws. Through the enactment of MPPA, Congress amended ERISA to require an employer who withdraws from a multiemployer pension plan to continue to pay additional contributions to the plan to

20

fund adequately certain unfunded pension benefits.

The obvious significance of the history of the MPPA to the instant case is that no comparable amendment act was ever adopted for welfare benefit plans. And the reason is equally obvious: The pertinent rules that apply to pension plans simply do not apply to welfare benefit plans. Given the substantial differences between pension plans and welfare benefit plans, the latter just do not experience the funding problems that are endemic to the former. For example, pension plans are subject to ERISA's vesting requirements and funding obligations, whereas welfare benefit plans are not.

IV

THE QUALIFYING EVENT

COBRA imposes on the sponsor of the plan that covered the individual when he experienced a qualifying event the duty of providing COBRA coverage. This statutory obligation arises at the moment the individual experiences a qualifying event that triggers a loss of coverage under the plan, and ends only upon the occurrence of one of the terminating events specified in § 602(2) of ERISA. Nothing contained therein permits the sponsor of a multiemployer plan to terminate or transfer its COBRA obligation to a withdrawing employer simply because, at a time after the individual experiences a qualifying event, the employer withdraws from the plan and sponsors its own plan for its own employees. On the contrary, the obligation to provide COBRA coverage to the individual remains with the plan sponsor of the multiemployer plan.

21

To recap:  The UFCW is a multiemployer plan, and the plain language of ERISA expressly designates the Board as the plan sponsor of the UFCW.  The SCP Qualified Beneficiaries experienced their COBRA qualifying events prior to September 1, 1992, at a time when they were covered under the UFCW.  Thus COBRA expressly imposes on the Board the duty to provide COBRA benefits to the SCP Qualified Beneficiaries until a terminating event occurs.  The fact that AppleTree ceased making contributions to the UFCW on August 31, 1992, and thereafter sponsored a group health plan for its employees could not and does not relieve the Board of its obligations to provide COBRA benefits to the SCP Qualified Beneficiaries.                     V

ERISA's "WRITTEN INSTRUMENT" REQUIREMENT

Another aspect of ERISA that helps to frame the proper perspective within which to consider the narrow issue of this case is the statute's "written instrument" requirement.  It prohibits the Board from shifting its COBRA obligation to AppleTree absent the required documentationSQdocumentation which here is non-existent.  To appreciate fully the true significance of this requirement in the instant appeal, a more extensive explanation of the above alluded to purpose and structure of multiemployer plans should prove beneficial.

Multiemployer plans typically are established and maintained to provide employee benefits to workers in particular industries.[6]

---

[6]  See Langbein & Wolk, Pension and Employee Benefits Law, 48-52; 359-2d, BNA Tax Management, "Multiemployer PlansSQSpecial Rules," A-1.

Multiemployer plans tend to be prevalent in those industries that have in common lower level workers who are employment-peripatetic by nature, such as the retail food, garment, trucking, mining, construction, and entertainment industries. Multiemployer plans are common in these and other similar industries, which are typified by many small companies that are "too small to justify an individual plan."[7] Multiemployer plans comprise the pooled assets of numerous employers (each of which usually makes contributions pursuant to collective bargaining agreements) and the income generated by those assets.[8] Thus, multiemployer plans generally have participant populations that are larger than those of single-employer plans, and generally experience better risk-spreading opportunities. To the extent multiemployer plans are larger, they also enjoy economies of scale unavailable to all but the largest single-employer plans. As a result, multiemployer plans often provide more favorable coverage to the participants and their beneficiaries than single employer plans are able to provide.

Of particular importance to the instant case is the widely recognized fact that multiemployer plans are common in those industries in which, due to seasonal or irregular employment and high labor mobility, few workers would qualify for coverage under

---

[7]  Langbein & Wolk, <u>Pension and Employee Benefits Law</u> at 49.

[8]  <u>See</u> <u>Central States, Southeast and Southwest Areas Pension Fund v. Central Transport</u>, 472 U.S. 559 (1985); <u>Schneider Moving & Storage Co. v. Robbins</u>, 466 U.S. 364 (1984); <u>Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck</u>, 870 F.2d 1148, 1154 (7th Cir. 1989) (en banc).

an individual employer's plan if one were established.[9]  For example, construction workers are frequently hired by a contractor for a single project that takes only a matter of weeks or months to complete.[10]  Once the project is finished, those workers may be unemployed until another contractor needs their particular skills for a different project.[11]  Thus, multiemployer plans, in contrast to single-employer plans, promote portability of benefits by workers whoSQgenerally not on their own volitionSQmove from one employer to another.[12]

A worker is eligible to participate in a single-employer plan because of his employment relationship with one particular employer.  In contrast, a worker is eligible to participate in a multiemployer plan because of his employment relationship with a particular industry and the several employers which participate in the plan.  Consequently, multiemployer plansSQunlike single-employer plansSQare able to achieve portability of benefits through a plan structure that permits a worker who moves from one employer to another within the plan's group of participating employers to enjoy continuous coverage under the plan.[13]  The United States Department of Labor ("DOL") also recognizes that multiemployer plans are primarily established and maintained for the purpose of

---

[9]  Langbein & Wolk, Pension Employee Benefit Law at 49.

[10]  Id.

[11]  Id.

[12]  Id. at 52.

[13]  Id.

24

permitting portability of benefits for the workers of a particular industry.[14]

Within that framework, the "written instrument" requirement is all the more meaningful. Section 402(a)(1) of ERISA expressly requires that "[e]very benefit plan shall be established and maintained pursuant to a written instrument."[15] The written instrument must "provide for one or more named fiduciaries who jointly or severally shall have the authority to control and manage the operation and administration of the plan."[16] One purpose of ERISA's "written instrument" requirement is to protect the interests of employees and their beneficiaries in employee benefit plans by giving them a clear understanding of their rights and obligations under the plan.[17] Recognizing that ERISA requires that

_____

[14] See 29 C.F.R. § 2510.3-37(c). The DOL requires a substantial business purpose before a multiemployer plan may be established. Such business purpose includes the interest of a labor organization in securing employee benefit plans for its members. The DOL examines four factors to determine the existence of a substantial business purpose, any one of which may be sufficient: (1) maintenance of a plan by a substantial number of unaffiliated contributing employers covering a substantial portion of a trade, craft or industry in terms of employees or locality; (2) closeness of relationship of benefits to years of service within the trade, craft or industry rather than with a given employer; (3) extent of collective bargaining in matters other than employee benefit plans between the employer organization and the employers maintaining the plan; and (4) the extent to which the administrative burden and expense of providing benefits through single-employer plans would be greater than through multiemployer plans.

[15] 29 U.S.C. § 1102(a)(1).

[16] Id.

[17] Cefalu v. B. F. Goodrich Co., 871 F.2d 1290, 1296 (5th Cir. 1989).

25

employee benefit plans and any changes made to such plans be in writing, we have held that we lack the power to create a federal common law remedy in this area because ERISA specifically and clearly addresses the issue.[18] Thus, participants and beneficiaries of employee benefit plans must be able to rely on the plans' written instruments for determination of benefits and determination of the party responsible for providing those benefits. Here, the UFCW designates the Board as that responsible party, and does so expressly and in writing.[19]

Further, the UFCW expressly grants its participants and beneficiaries the right to elect COBRA coverage under the UFCW when a qualifying event triggering loss of coverage thereunder is experienced.[20] There is nothing written in the UFCW, however, that permits the Board to terminate an individual's COBRA coverage under the plan when and if that individual's former employer withdraws from the plan and subsequently sponsors a group health plan for its own employees. Under the statute, the pertinent plan provisions, and the applicable legal authorities, it is the BoardSQnot a formerly participating employerSQwhich is obligated by law and under the terms of the UFCW to provide COBRA benefits to the SCP Qualified Beneficiaries. For us to hold otherwise would violate ERISA's "written instrument" requirement and improperly deny the

---

[18] Id. at 1297.

[19] See §§ 1.33 and 4.5 of the UFCW; §§ 1.8, 7.1, 7.2, 7.3, 8.1 and 9.2 of UFCW's Trust Agreement.

[20] See § 2.8 of the UFCW.

26

SCP Qualified Beneficiaries their right to uninterrupted COBRA coverage under the UFCW.

Additionally, for us to rule in this case in the manner urged by the Board could broadly but adversely affect the current structure and operation of multiemployer plans, including the rights and obligations of the participants and participating employers alike. As noted, over longer periods of time, workers in a given industry tend to work for numerous employers within that industry. It was principally in recognition of this revolving door facet of such employment that employers and union representatives devised the multiemployer plan. Such a plan provides the means to ensure maintenance of a desired level of benefits for workers who toil in a particular industry and who change employers with some frequency. Through participation in a multiemployer plan, both the workers and the employers understand that the plan will continue to provide health coverage to such workers even though they may work for two or more employers which participate in the plan at different times. Clearly, if we were now to permit plan sponsors to shift their COBRA obligations to employers such as AppleTree, plan sponsors of multiemployer plans would be able to deny participants their "portability of benefits" right without being required to amend the plan's written instrument as required by ERISA.

In turn, the denial of the portability right could severely affect other benefit rights of the participants in multiemployer plans. For example, if AppleTree were required to provide the SCP

27

Qualified Beneficiaries with COBRA coverage under the new, single-employer AppleTree plan, the SCP Qualified Beneficiaries would become participants in the AppleTree plan and would be terminated as participants in the UFCW as of August 31, 1992. This termination of coverage under the UFCW might well produce harsh consequences to the SCP Qualified Beneficiaries. First, to the extent that the level of coverage provided under the AppleTree plan were less favorable than the coverage provided under the UFCW, the SCP Qualified Beneficiaries would suffer a diminution in coverage (for, as noted earlier, multiemployer plans generally provide more favorable coverage than single-employer plans given economies of scale).

Second, such a termination of participation might adversely affect the level of the SCP Qualified Beneficiaries' coverage under the UFCW when and if they were subsequently to become employed by other participating employers during their COBRA coverage period. For example, if an SCP Qualified Beneficiary were to be employed subsequently by a participating employer of the UFCW, that worker would again be required to meet the eligibility requirements of the UFCW prior to receiving the level of coverage to which he had been entitled immediately before his participation in the UFCW ended on August 31, 1992.[21] Also, to the extent that the "pre-existing condition" exclusion of certain ailments or diseases might apply to the SCP Qualified Beneficiary, he would now be denied coverage for such conditions, even though he would otherwise have continued to

---

[21] See §§ 2.3 and 2.5 of the UFCW.

be entitled to coverage for them had his COBRA coverage not been terminated.[22]

Clearly, the public interestSQand the intent of CongressSQin encouraging the formation of employee benefit plans could be adversely affected if we were to hold that AppleTree, rather than the Board, is obligated to provide COBRA benefits to the SCP Qualified Beneficiaries. And just as participants and beneficiaries must be able to rely on the plan's written instrument, so too must employers be able to rely on the plan's written instrument to determine their obligations. Employers are frequently discouraged from participating in or forming employee benefit plans if they perceive potential exposure to unlimited liability for participants' benefits. This is another reason for which ERISA requires the instrument to define in writing the employers' obligations under the plan.

Notably, neither the UFCW nor any other plan document either expressly or impliedly permits the Board to shift its COBRA obligations to AppleTree simply because the SCP Qualified Beneficiaries happened to have been employed by AppleTree when those beneficiaries experienced their COBRA qualifying event under the UFCWSQand AppleTree subsequently sponsored a group health plan for its own employees. That is <u>not</u> to say that the UFCW or the other plan documents could not have so provided. I simply note the fact that the UFCW does not in writing impose any liability on the withdrawing employer to subsidize the plan's cost of providing

---

[22]  <u>See</u> § 4.4 of the UFCW.

29

COBRA benefits; but neither does it permit recovery by the withdrawing employer of any reserves attributable to the contributions such employer may have made to the UFCW. Again, I do not mean to suggest that the plan documents could not so provide; I simply observe that no such writing exists in connection with the UFCW. The admittedly belabored point I make is that in the absence of contrary written provisions ERISA does not allow the Board to evade its COBRA obligation simply because the financial soundness of the UFCW may be adversely affected if the Board is required to provide COBRA coverage to the SCP Qualified Beneficiaries.

VI

AD HOMINEM

In closing, I am constrained to comment on another aspect of the position urged by the Board in this case. Given the strong motivation of the entities and organizations that bargain so vigorously with the employers for the adoption of multiemployer plansSQa central feature of which is the designation of the Board rather than the employer as the plan sponsorSQI find illogical, if not disingenuous, the strident urgings of the Board to this court that we mystically pass the mantle of plan sponsor from the Board to the employer, thereby imposing liability on AppleTree for the costs of providing COBRA benefits to the SCP Qualified Beneficiaries. The constant emphasis of such bargaining is, as noted above, the ability to ensure to the workers the portability of their plan benefits and the avoidance of breaks in coverage and such attendant evils as requalification, delay periods for

30

eligibility, and exposure to denial of coverage of "new" pre-existing conditions that were not pre-existingSQand thus were not excluded from coverageSQfor purposes of former participation in the same plan.  It ill behooves those whose minions benefit so greatly from the Board's position as plan sponsor to gainsay such sponsorship for the expediency of shifting COBRA costs to the departing or withdrawing employer.

VII

CONCLUSION

To repeat, I wholeheartedly concur in Judge Smith's opinion that, based on the plain language of ERISA and UFCW's written instruments, the Board is the plan sponsor and thus is obligated to provide COBRA coverage to SCP Qualified Beneficiaries under the UFCW until a statutory event should occur to trigger termination of such coverage.  The fact that AppleTree withdrew from the UFCW and thereafter sponsored a single-employer group health plan for its employees after the SCP Qualified Beneficiaries became entitled to receive COBRA coverage under the UFCW is clearly <u>not</u> an event that terminates the Board's obligations to provide COBRA coverage to the SCP Qualified Beneficiaries.  I find that the broad perspective in which this decision can and should be viewed provides additional undergirding for the majority opinion, consistent with the policies, reasons and rationale of ERISA and COBRA and the raison d'etre of multiemployer plans.