# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 27, 2015

Lyle W. Cayce
Clerk

No. 14-60915

HOWARD HUGHES COMPANY, L.L.C., formerly known as Howard Hughes Corporation and Subsidiaries,

Petitioner - Appellant

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee

--------------------------------------------------------------
Cons/w Case No. 14-60921
HOWARD HUGHES PROPERTIES, INCORPORATED,

Petitioner - Appellant

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee

Appeals from a Decision of the
United States Tax Court

Before KING, DENNIS, and OWEN, Circuit Judges.

KING, Circuit Judge:

Petitioners–Appellants used the completed contract method of accounting in computing their gains from sales of property under long-term

No. 14-60915

construction contracts. The Internal Revenue Service challenged the method of accounting, arguing that the contracts at issue do not qualify as home construction contracts and that Petitioners–Appellants should therefore have used the percentage of completion method in computing their gains. The Tax Court sided with the Internal Revenue Service. We AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioners The Howard Hughes Company, LLC (THHC) and Howard Hughes Properties, Inc. (HHPI) are subsidiaries of the Howard Hughes Corp., an entity involved in selling and developing commercial and residential real estate. Among the real estate holdings originally owned by Howard Hughes Corp. is a 22,500-acre plot of land west of downtown Las Vegas, Nevada, known as Summerlin. In the 1980s this land was selected for development and was divided into three geographic regions: Summerlin North, Summerlin South, and Summerlin West.[1] Each of the Summerlin geographical regions was further divided into villages, which were then divided into parcels or neighborhoods containing individual lots. Petitioners intended to develop Summerlin as a large master-planned residential community. To secure the rights to develop Summerlin, Petitioners reached master development agreements (MDAs) with the City of Las Vegas and Clark County, which required Petitioners to submit village development plans for municipal approval.

Petitioners generated revenue from their holdings in Summerlin by selling property within the community to commercial builders or individual buyers who would then construct homes on the property. The first land sales

---

[1] As of today, THHC owns Summerlin West and HHPI owns Summerlin North and Summerlin South, excluding any tracts of land within each region that have been sold to third parties. Since its development, Summerlin has grown into a residential community with approximately 100,000 residents living in 40,000 homes as of 2010.

No. 14-60915

in Summerlin North took place approximately in 1986, in Summerlin South in 1998, and in Summerlin West in 2000.[2] Petitioners' sales generally fell into one of four categories: pad sales, finished lot sales, custom lot sales, or bulk sales. In a pad sale, Petitioners would construct all the infrastructure in a village up to a parcel boundary and then sell a parcel to a homebuilder who would be responsible for any subdivision of the parcel, infrastructure in the parcel, and any construction therein. In a finished lot sale, Petitioners divided the parcels into lots, constructed the village and parcel infrastructure up to the individual lot lines, and then sold neighborhoods to buyers. For both pad sales and finished lots sales, Petitioners reached building development agreements (BDAs) that required the buyers–builders to do further development work on the property. In custom lot sales, Petitioners sold individual lots to buyers who were contractually bound to build residential dwelling units. And in bulk sales, Petitioners sold entire villages to buyers who would then subdivide the villages into parcels and be responsible for all of the infrastructure improvements within the villages.

Under the land sale contracts and MDAs, Petitioners were obligated to construct infrastructure and other common improvements in Summerlin. The MDAs Petitioners signed with municipal authorities required the construction of parks, roadways, fire stations, flooding facilities, and other infrastructure. And the BDAs required Petitioners to construct roads and utility infrastructure such as water and sewer systems up to the line of the lots sold to homebuilders, who would then assume responsibility for completing the infrastructure on their lots.[3] Important to this case, Petitioners did not build

---

[2] The tax deficiencies at issue here, however, only relate to contracts involving Summerlin South and Summerlin West.

[3] The costs attributable to these common improvement activities that were incurred by Petitioners exceeded 10% of the various total contract prices. Under an operative Treasury Regulation, a contract cannot be a construction contact "if the contract includes the provision

No. 14-60915

homes, perform any home construction work, or make improvements within the boundaries of any lots in Summerlin.

For the tax years at issue (2007 and 2008), Petitioners used the "completed contract method" of accounting in computing gain for tax purposes from their long-term contracts for the sale of residential property in Summerlin West and South.  By using this method, Petitioners deferred reporting income on a contract for the sale of land until the contract was "complete," i.e., until the year in which Petitioners' incurred costs reached 95% of their estimated contract costs.[4]  *See* Treas. Reg. § 1.4601-(c)(3)(A).  This is in contrast to the general method of reporting income for tax purposes under long-term contracts, the "percentage of completion" method.   The percentage of completion method requires a taxpayer to recognize gain or loss annually in proportion to the progress the taxpayer has made during the year toward completing the contract, determined by comparing costs allocated and incurred before the end of the year to the estimated contract costs.[5]  Petitioners claimed

---

of land by the taxpayer and the estimated total allocable contract costs, as defined in paragraph (b)(3) of this section, attributable to the taxpayer's construction activities are less than 10 percent of the contract's total contract price."  Treas. Reg. § 1.4601-(b)(2)(ii).

[4] As noted by one treatise:

> Under the completed contract method, the taxpayer does not report income until the tax year in which the contract is completed and accepted . . . .  Expenses allocable to the contract are deductible in the year in which the contract is completed.  Expenses not allocated to the contract (i.e., period costs) are deductible in the year in which they are paid or incurred, depending on the method of accounting employed.

*U.S. Master Tax Guide* ¶ 1552 (96th ed. 2013).

[5] More specifically:

> Under the percentage-of-completion method, gross income is reported annually according to the percentage of the contract completed in that year.   The completion percentage must be determined by comparing costs allocated and incurred before the end of the tax year with the estimated total contract costs (cost-to-cost method or simplified cost-to-cost method).  Thus, for a particular tax year, the taxpayer includes a portion of the total contract price in gross

No. 14-60915

that they were entitled to use the completed contract method because their contracts were "home construction contracts" under I.R.C. § 460(e)(1).

Respondent, the Commissioner of Internal Revenue (the Commissioner), disagreed with Petitioners' method of accounting and issued notices of deficiency for the 2007 and 2008 tax years, changing the method of accounting as the Commissioner is authorized to do under I.R.C. § 446(b). The Commissioner asserted that Petitioners were required to use the percentage of completion method to report gains or losses under their contracts. As a result of this change in the method of accounting, the Commissioner increased Petitioners' taxable income for 2007 and 2008 as follows:

| Petitioner | 2007 | 2008 | Total |
|---|---|---|---|
| THHC | $209,875,725 | $19,399,420 | $229,275,145 |
| HHPI | $156,303,168 | $37,192,046 | $193,495,214 |

Petitioners challenged the deficiencies[6] in the United States Tax Court. The Tax Court held that Petitioners' contracts were long-term contracts within I.R.C. § 460 but were not "home construction contracts" under I.R.C. § 460(e)(6)(A) that would permit the use of the completed contract method. *Howard Hughes Co., LLC v. Comm'r*, 2014 WL 10077466, at *14–25 (T.C. June 2, 2014).

income as the taxpayer incurs allocable contract costs for the year. Any contract income that has not been included in the taxpayer's gross income by the end of the tax year in which the contract is completed is included in gross income for the following tax year.

*U.S. Master Tax Guide* ¶ 1552.

[6] Other adjustments by the Commissioner, when added to the increases in Petitioners' taxable income, resulted in the Commissioner assessing the following total deficiencies against Petitioners:

| Petitioner | 2007 | 2008 |
|---|---|---|
| THHC | $73,456,504 | $6,789,797 |
| HHPI | $156,303,168 | $13,228,620 |

5

No. 14-60915

Interpreting the "home construction contracts" exception in I.R.C. § 460(e)(6)(A) and its accompanying regulations, the Tax Court based its reasoning on three points. First, provisions of the Internal Revenue Code permitting the deferral of income (such as § 460(e)(6)(A)) are to be "strictly construed." *Id.* at *18. Second, Petitioners' costs do not come within subsection (i) of § 460(e)(6)(A), which requires that costs be incurred "with respect to" dwelling units. According to the Tax Court, Petitioners did not engage in any activities "attributable to the construction of the dwelling units" because they did not intend to build dwelling units and their costs did not have a sufficient causal nexus to the construction of dwelling units. *Id.* at *21. The lack of any home construction activity on the part of Petitioners was particularly important to the Tax Court. Apart from the statutory text, the court pointed to the legislative history of the Technical and Miscellaneous Revenue Act of 1988 (TAMRA), which gave birth to § 460(e)(6)(A) and which suggested that the home construction contract exception to the use of the percentage of completion method was specifically directed toward taxpayers involved in building homes. *Id.* at *21–22.

Third, Petitioners' costs did not come within subsection (ii) of § 460(e)(6)(A) as the costs were not incurred for improvements "on the site of such dwelling units," a phrase which the court interpreted to mean "the individual lot." *Id.* The Tax Court also rejected Petitioners' arguments that their common improvement costs came within subsection (ii) because of a regulation that counted common improvement costs towards home constructions costs.[7] According to the court, the regulation required the

---

[7] The regulation states:

(2) Home construction contract—(i) In general. A long-term construction contract is a home construction contract if a taxpayer (including a subcontractor working for a general contractor) reasonably expects to attribute

taxpayer to "at some point incur some construction cost with respect to the dwelling unit to include these costs in the dwelling unit cost," but "[Petitioners] ha[d] no dwelling unit costs in which to include the common improvement costs." *Id.* at *23.[8] The court concluded its opinion by "draw[ing] a bright line," under which a "contract [could] qualify as a home construction contract only if the taxpayer builds, constructs, reconstructs, rehabilitates, or installs integral components to dwelling units or real property improvements directly related to and located on the site of such dwelling units." *Id.* at *25. It held that this rule was necessary to keep costs that were attenuated to home construction from being the basis for the completed contract method of accounting. *Id.*

The Tax Court issued its consolidated decision on June 2, 2014, and entered decisions finally disposing of Petitioners' claims on September 15,

---

80 percent or more of the estimated total allocable contract costs (including the cost of land, materials, and services), determined as of the close of the contracting year, to the construction of—
>    (A) Dwelling units, as defined in section 168(e)(2)(A)(ii)(I), contained in buildings containing 4 or fewer dwelling units (including buildings with 4 or fewer dwelling units that also have commercial units); and
>    (B) Improvements to real property directly related to, and located at the site of, the dwelling units.

(ii) Townhouses and rowhouses. Each townhouse or rowhouse is a separate building.

(iii) Common improvements. A taxpayer includes in the cost of the dwelling units their allocable share of the cost that the taxpayer reasonably expects to incur for any common improvements (e.g., sewers, roads, clubhouses) that benefit the dwelling units and that the taxpayer is contractually obligated, or required by law, to construct within the tract or tracts of land that contain the dwelling units.

Treas. Reg. § 1.460-3(b)(2).

[8] The Tax Court noted that regulations proposed in 2008, but not yet adopted by the Treasury Department, would have allowed for common improvement costs to come within "home construction costs" even if a contract did not provide for the construction of a dwelling unit. *Id.* at *24 n.19. However, the court declined to attach any importance to the regulations and added that they supported the view that common improvement costs were not covered by the statute and existing regulations. *Id.*

No. 14-60915

2014.  Petitioners then timely appealed the decision of the Tax Court.  We have jurisdiction under I.R.C. § 7482(a)(1).

## II. STANDARD OF REVIEW

"In reviewing Tax Court decisions, we apply the same standard as applied to district court determinations." *Rodriguez v. Comm'r*, 722 F.3d 306, 308 (5th Cir. 2013).  Because this case presents a question of statutory interpretation, an issue of law, "the proper standard of review is *de novo*." *BMC Software, Inc. v. Comm'r*, 780 F.3d 669, 674 (5th Cir. 2015).

## III. THE HOME CONSTRUCTION CONTRACTS EXCEPTION

The case before us concerns a matter of statutory interpretation of the Internal Revenue Code.  In particular, the issue is whether or not Petitioners' contracts were "home construction contracts" within the meaning of I.R.C. § 460(e)(6)(A), thereby making Petitioners eligible to use the completed contract method of accounting.  Our statutory analysis here is guided by two principles.  The first is that in deciding "question[s] of statutory interpretation, we begin, of course, with the words of the statute." *Phillips v. Marine Concrete Structures, Inc.*, 895 F.2d 1033, 1035 (5th Cir. 1990) (en banc).  This entails not only looking to language of the statute, but also "follow[ing] 'the cardinal rule that statutory language must be read in context.'" *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting *Gen. Dynamics Land Sys. Inc., v. Cline*, 540 U.S. 581, 596 (2004)).  The second is "the well settled principle that statutes granting tax exemptions or deferments must be strictly construed." *Elam v. Comm'r*, 477 F.2d 1333, 1335 (6th Cir. 1973); *see also United States v. Centennial Sav. Bank FSB*, 499 U.S. 573, 583 (1991) ("[T]ax-exemption and -deferral provisions are to be construed narrowly.").  As we conclude today, the Tax Court faithfully applied both these precepts in holding that Petitioners' contracts were not "home construction contracts."

No. 14-60915

**A.**

The "home construction contract" exception is part of a broader statutory provision, I.R.C. § 460, covering how taxpayers must report income on long-term contracts. Section 460 was first enacted as part of the Tax Reform Act of 1986 in response to the latitude taxpayers had previously enjoyed in choosing a method of accounting for long-term contracts. *See* STAFF OF THE JOINT COMM. ON TAX'N, 99th Cong., GENERAL EXPLANATION OF THE TAX REFORM ACT OF 1986 527 (Comm. Print 1987) ("Congress believed that the completed contract method of accounting for long-term contracts permitted an unwarranted deferral of income from those contracts."). The provision removed this latitude and instead required taxpayers to account for long-term contracts using the percentage of completion method. *See* I.R.C. § 460(a).

While § 460 generally prohibits the use of the completed contract method, there are two exceptions found in I.R.C. § 460(e)(1) that allow the use of this method.[9] The first (not at issue here) is an exception for long-term

---

[9] This provision, in full, states:

(1) In general.—Subsections (a), (b), and (c)(1) and (2) [detailing the percentage of completion method of accounting] shall not apply to–
    (A) any home construction contract, or
    (B) any other construction contract entered into by a taxpayer–
        (i) who estimates (at the time such contract is entered into) that such contract will be completed within the 2-year period beginning on the contract commencement date of such contract, and
        (ii) whose average annual gross receipts for the 3 taxable years preceding the taxable year in which such contract is entered into do not exceed $10,000,000.

In the case of a home construction contract with respect to which the requirements of clauses (i) and (ii) of subparagraph (B) are not met, section 263A shall apply notwithstanding subsection (c)(4) thereof.

I.R.C. § 460(e)(1).

construction contracts expected to be completed within two years of the commencement date, if performed by taxpayers whose annual gross receipts averaged $10 million or less for the three preceding taxable years. I.R.C. § 460(e)(1)(B). The second is the exception for "home construction contracts" at issue today. I.R.C. § 460(e)(1)(A). The exception was added in 1988 under the TAMRA. Pub. L. No. 100-647, § 5041, 102 Stat. 3342, 3673. Although it is unclear precisely why the exception was added, statements surrounding its enactment suggest that Congress was concerned about problems that homebuilders had experienced in using the percentage of completion method.[10]

The term "home construction contract" is defined in the statute under § 460(e)(6)(A). That provision qualifies a contract as a home construction contract if:

> 80 percent or more of the estimated total contract costs (as of the close of the taxable year in which the contract was entered into) are reasonably expected to be attributable to activities referred to in paragraph 4 [building, construction, reconstruction, rehabilitation, or integral component installation] with respect to—
>> (i) dwelling units (as defined in section 168(e)(2)(A)(ii)) contained in buildings containing 4 or fewer dwelling units (as so defined) and
>> (ii) improvements to real property directly related to such dwelling units and located on the site of such dwelling units.

I.R.C. § 460(e)(6)(A).

---

[10] In particular, Senator Dennis DeConcini noted that "homebuilders receive very small down payments and usually incur significant costs to develop the land and finish the home before receiving the final payment," and that "[t]he homebuilder does not receive progress payments," making it difficult for homebuilders to recognize income throughout the contract under the percentage of completion method. 134 Cong. Rec. 29,962 (1988). When the provision emerged from the conference report, Representative William Archer, Jr. stated in support of it: "I was particularly pleased that we changed the 'completed contract method of accounting' provisions under current law to exempt single family residential construction—thereby reducing the cost of homes." 134 Cong. Rec. 33,112 (1988).

No. 14-60915

As the Tax Court recognized, this statute creates an "80% test" that allows a contract to qualify as a "home construction contract" if 80% of its costs come from construction activities directed toward subsections (i) and (ii) of the statute. *Howard Hughes Co.*, 2014 WL 10077466, at \*19. Our analysis next turns to whether Petitioners come within either subsection.

**B.**

Subsection (i) of § 460(e)(6)(A) states that construction activities satisfy the 80% test if they "are reasonably expected to be attributable to activities referred to in paragraph (4) with respect to . . . dwelling units." The Tax Court held that this subsection applies "only if the taxpayer builds, constructs, reconstructs, rehabilitates, or installs integral components to dwelling units." *Id.* at \*25. A plain reading of the statute supports the Tax Court's holding. Subsection (i) refers to "activities . . . with respect to . . . dwelling units." Since a dwelling unit is "a house or apartment used to provide living accommodations," I.R.C. § 168(e)(2)(A)(ii)(I), this necessarily means that a taxpayer seeking to use the completed contract method must be engaged in construction, reconstruction, rehabilitation, or installation of an integral component of a home or apartment. This reading is further supported by the definition of "activities" in subsection § 460(e)(4) as "building, construction, reconstruction, or rehabilitation of, or the installation of any integral component to, or improvements of, real property." Petitioners argue that this reading imposes a "homebuilder requirement," turning the eligibility of using the completed contract method on the identity of the taxpayer rather than on the costs incurred. This is incorrect. While homebuilders certainly come within subsection (i), the activities listed in § 460(e)(4) can encompass subcontractors so long as their costs come from work done on a dwelling unit. Because "the costs [P]etitioners incur[red] [we]re not the actual homes' structural, physical construction costs," or were not related to work on dwelling

11

units, Petitioners do not come within subsection (i).  *Howard Hughes Co.*, 2014 WL 10077466, at *23.

As an alternative, Petitioners argue that the phrase "with respect to" in the statute only requires some causal relationship between the dwelling units and construction costs incurred.  Petitioners argue that their work satisfies this causal relationship since the common improvements and community infrastructure in Summerlin would not have been built by Petitioners but "for the contractually required construction of dwelling units."  The Tax Court squarely rejected this reading, however.  It noted that "Petitioners' interpretation of the statute would make any construction cost tangentially related to a dwelling unit . . . a cost to be counted in determining whether a contract is a home construction contract."  *Id.* at *21.  The Tax Court correctly recognized that this interpretation could not be harmonized with the narrow exceptions to the percentage of completion method for long-term contracts provided by Congress and the principle that tax deferments are to be strictly construed.

Furthermore, if construction costs need only have some causal relationship with a dwelling unit to come within subsection (i), then costs from "improvements to real property directly related to such dwelling units and located on the site of such dwelling units" should also come within subsection (i).  However, Congress has separately codified those costs in subsection (ii).  And in statutory interpretation we generally follow "the rule against superfluities, [which] instructs courts to interpret a statute to effectuate all its provisions, so that no part is rendered superfluous."  *Hibbs*, 542 U.S. at 89.  We cannot accept Petitioners' broad reading of "with respect to" as it would render subsection (ii) superfluous.

No. 14-60915

## C.

Petitioners next argue that their construction contracts fall within subsection (ii) of § 460(e)(6)(A).  The Tax Court correctly rejected that argument because Petitioners' construction activities for common improvements were not "located on the site of such dwelling units."  The court held that the word "site" in the statute meant a single site of a building otherwise described as a "lot."  *Howard Hughes Co.*, 2014 WL 10077466, at *22.  Because Petitioners never made improvements on the lots where homes were built, the Tax Court concluded that Petitioners' construction activities did not come within the plain language of the statute.  Petitioners argue here, as they did below, that the word "located on the site" refers to "construction that occurs in the residential subdivision" or "at least the entire village."  In particular, Petitioners point to the fact that the term "site" is used in the singular, implying that a single "site" will include many "dwelling units."  But the Tax Court's construction of the word "site" takes into account that a single "site" will include "dwelling units," and it is consistent with the statute.  As the Tax Court observed, subsection (i) of the statute allows "a construction contract for a building with four or fewer dwelling units to still be considered a home construction contract."  *Id.* at *22.  A single "site" of "a building" (otherwise known as a "lot") would thus include "dwelling units," plural, because subsection (i) contemplates that buildings can include more than one dwelling unit.  Petitioners' contrary reading of "site" is far too broad[11] and conflicts with the principle that statutes granting tax deferment are construed narrowly.  Petitioners do not fall within the plain language of subsection (ii).

---

[11] While Petitioners state that "site" can mean a subdivision or a village, they offer no limiting definition of the term.  Under Petitioners' definition, "site" could mean a location even broader than a village.

No. 14-60915

Apart from the statutory text, Petitioners argue that they qualify for the tax deferment contemplated by the statute as the result of a Treasury regulation that flows from subsection (ii). That regulation states:

> A taxpayer includes in the cost of the dwelling units their allocable share of the cost that the taxpayer reasonably expects to incur for any common improvements (e.g., sewers, roads, clubhouses) that benefit the dwelling units and that the taxpayer is contractually obligated, or required by law, to construct within the tract or tracts of land that contain the dwelling units.

Treas. Reg. § 1.460-3(b)(2)(iii). Petitioners argue that this regulation allows them to count their common improvement costs in the 80% test since it directly refers to the type of "common improvements" they constructed. Furthermore, Petitioners argue that the regulations show that the term "site" has a broader meaning than the Tax Court's interpretation. This is because § 1.460-3(b)(2)(iii) uses the phrase "tracts of land that contain the dwelling units" and another regulation uses the phrase "*at* the site of [] the dwelling units," Treas. Reg. § 1.460-3(b)(2)(i)(B), instead of the statutory phrase "*on* the site of such dwelling units."

Petitioners' arguments are unpersuasive. The Commissioner repeatedly rejected Petitioners' reading of the regulation at oral argument, in the briefing, and in previous internal memoranda. *See* I.R.S. Tech. Adv. Mem. 200552012, 2005 WL 3561182 (Dec. 30, 2005).[12] Assuming, *arguendo*, that the regulation

---

[12] The Commissioner asserted in the briefing and admitted at oral argument that this regulation is not derived from the language of § 460(e)(6)(A) but is instead derived from a general grant of rulemaking authority under § 460(h). The Commissioner argued that the regulation was promulgated to remedy a gap in the statute. It was previously thought that § 460(e)(6)(A) would not allow "a builder of a planned community . . . [to] us[e] the completed contract method of accounting based on common improvement costs, if the allocable share of those costs exceed[ed] 20 percent of the total allocable costs of a contract for the sale of a house within a community." The ensuing regulation was designed, according to the Commissioner, to address this issue. The Commissioner's reading of the regulation as having no basis in § 460(e)(6)(A) may be problematic. However, we need not decide that or delve into

does construe § 460(e)(6)(A)(ii), the Tax Court concluded that Petitioners do not come within this regulation. Section 1.460-3(b)(2)(iii) allows a taxpayer to "include in *the cost of the dwelling units . . .* any common improvements." Treas. Reg. § 1.460-3(b)(2)(iii) (emphasis added). The Tax Court noted that this meant that "the taxpayer must [have] at some point incur[red] some construction cost with respect to the dwelling unit to include [common improvement] costs in the dwelling unit cost." *Howard Hughes Co.*, 2014 WL 10077466, at *23. However, "Petitioners ha[d] no dwelling unit costs in which to include the common improvement costs." *Id.*

Petitioners argue that the Tax Court improperly inferred a prohibition from an affirmative regulation and that the Tax Court unfairly imputed a requirement to incur dwelling unit costs from § 460(e)(6)(A)(i), when the regulation only modifies § 460(e)(6)(A)(ii). The Tax Court properly interpreted the plain language of the regulation. The regulation sets out how common improvement costs can be eligible for inclusion in the 80% test, and Petitioners' costs are not eligible under the plain terms of the regulation.[13] As the Tax Court noted, the plain text refers to the "costs of the dwelling units," meaning that there must be dwelling unit costs before taxpayers can count their common improvement costs towards the 80% test.

Finally, Petitioners point to regulations proposed in 2008 (but not yet adopted) providing that taxpayers can meet the 80% test with "a contract for the construction of common improvements . . . even if the contract is not for the construction of any dwelling unit." 73 Fed. Reg. 45,180, 45,180 (Aug. 4, 2008); *see also* Prop. Treas. Reg. § 1.460-3(b)(2) (2008). Petitioners

---

the issue any deeper because Petitioners do not come within the regulation even if it does modify § 460(e)(6)(A)(ii).

[13] Like any measure defining the eligibility for a particular benefit, this regulation will necessarily be exclusory or "prohibitive" in applications where an entity does not meet the eligibility criteria.

argue that these regulations "refute the Tax Court's interpretation of the statute" and show that the statute does not limit the statute to "only those taxpayers with direct dwelling-unit-construction costs." But we have noted that "proposed regulations are entitled to no deference until final." *Matter of Appletree Markets, Inc.*, 19 F.3d 969, 973 (5th Cir. 1994); *see also id.* ("To give effect to regulations that have merely been proposed would upset the balance of powers among the constitutional branches."). We attach no weight to the proposed regulations.[14] Petitioners' construction costs do not fall within § 460(e)(6)(A)(ii).

## IV. CONCLUSION

Petitioners' contracts are not "home construction contracts" under I.R.C. § 460(e)(6)(A). We AFFIRM.

---

[14] The proposed regulations, if anything, undermine Petitioners' position that the statute includes common improvement costs in the 80% test without dwelling unit construction. The preamble to the proposed regulations states that they "expand the types of contracts eligible for the home construction contract exemption." 73 Fed. Reg. 45,180, 45,180 (Aug. 4, 2008). This passage suggests the proposed regulations are beyond the scope of § 460(e)(6)(A). But, as Petitioners note elsewhere in their briefing, regulations cannot "expand the universe of qualifying costs."