**Gary L. DRAPER, Plaintiff,**

v.

**BAKER HUGHES INCORPORATED, Defendant.**

No. Civ. S–93–849–WBS.

United States District Court, E.D. California.

March 10, 1995.

William F. Murphy, Dillingham and Murphy, San Francisco, CA, for plaintiff.

Louis J. Anapolsky, Knox Lemmon Brady Anapolsky and Sheridan, Sacramento, CA, for defendant.

## MEMORANDUM OF DECISION

SHUBB, District Judge.

Plaintiff brought this action alleging three violations of the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq.: (1) charge of an excessive premium for continued health insurance in violation of 29 U.S.C. § 1162; (2) failure to provide requested plan documents in violation of 29 U.S.C. § 1132; and (3) breach of fiduciary duty to disclose information in violation of 29 U.S.C. §§ 1104(a) and 1109.

This action came on regularly for trial, without a jury, on February 28, March 1, 2, and 3, 1995. Having considered the evidence presented and the arguments of counsel, the court now makes the following findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

## BACKGROUND

Plaintiff Gary L. Draper worked for defendant Baker Hughes Incorporated (BHI) for approximately 27 years. In his last three years of employment, plaintiff occupied two executive level positions for subsidiaries of BHI located in Europe.[1]

BHI is a large corporation with over 500 divisions and subsidiaries located throughout the world. Some, but not all, of these divisions are separately incorporated. Likewise, some, but not all, of the divisions are profit-generating, operating divisions, while others perform administrative functions.

On or about October 1, 1990, BHI grouped all its "expatriate" employees working outside of the United States into the Baker Hughes Corporate division for benefits and payroll purposes.[2] Thus, although plaintiff managed the day to day operations of a BHI division in France, he was classified as a Baker Hughes Corporate employee for benefits purposes. Baker Hughes Corporate is an administrative division which operates out of Houston, Texas. In 1991, it was comprised of about 120 employees.

BHI sponsors a group health plan which is subject to ERISA. BHI's health plan is not self-funded or self-insured. It is insured by Provident Life & Accident Insurance Company (Provident). Although the health plan offers different types of coverage, it is a single, as opposed to multi-employer, health plan.

BHI negotiates a new agreement with Provident on an annual basis. BHI is Provident's largest customer, and when BHI negotiates the insurance coverage and applicable premiums, it does so on behalf of all BHI

---

1. Plaintiff became Vice–President of WEMCO–France, SA in October 1988. WEMCO–France, SA was a division of Baker Hughes Process Technology Europe (also called "Baker Hughes Process Equipment Europe"). Baker Hughes Process Technology Europe is an operating division of Baker Hughes International. While still with WEMCO–France, plaintiff assumed the position of President of Baker Hughes Pumps Europe in October 1990. Baker Hughes Pumps Europe is a division of Baker Hughes Process Technology Europe.

2. Another division of BHI, Baker Oil Tools, administers the payroll for employees classified in the Baker Hughes Corporate division.

employees. BHI's group medical and dental plan covered approximately 11,136 employees for the fiscal plan year beginning October 1, 1991. According to Provident's representative, Jennifer Sweaney, BHI paid approximately $40,000,000.00 in premiums for its medical and dental plan.

BHI pays one monthly premium to Provident for the group medical and dental plan. The premium is determined in accordance with an eleven step process, as described by Ms. Sweaney. In the first step, BHI presents the claims experience for each division to Provident. Provident then combines the numbers of the various divisions. Then, in steps two through ten, Provident considers BHI as a whole. It is in these steps that BHI's premium is determined. In the final step, after Provident has determined the premium for BHI as a whole, it breaks that premium down to a division by division format. Provident does so at BHI's request, so that BHI may use these figures in adjusting the amount it rebills each division. The critical fact is that Provident calculates the premium for BHI employees as a whole, without regard to the risk experiences of particular divisions.

BHI, not a division of BHI, pays Provident a monthly premium. BHI then rebills the divisions. BHI calculates the amounts each division owes according to the "risk experience" of that division. BHI's company policy is that each division must account separately for the medical expense incurred by that division. Thus, each benefits division reimburses BHI for its relative burden on the group medical and dental plan. Since the risk experience of divisions differ, divisions pay different amounts per employee. Unlike the contributions made by the divisions, which vary from division to division, the contributions of active employees for the same type of coverage are identical throughout the entire company, regardless of the division to which they may belong.[3]

Only 30 of BHI's divisions administer benefits. Plaintiff worked primarily for WEM-CO–France, an operating division which did not itself administer benefits. For benefits purposes, during the relevant time periods, BHI placed plaintiff, along with three other executive officers of BHI divisions in Europe, into the Baker Hughes Corporate division. BHI's placement of plaintiff and the other expatriates in the Baker Hughes Corporate division appears to have been made for administrative convenience.[4] Accordingly, as the division to which plaintiff had been assigned for benefits purposes, Baker Hughes Corporate paid BHI for group medical coverage according to the risk experienced by Baker Hughes Corporate employees during the preceding year.

While an employee of BHI, plaintiff elected health insurance coverage for himself and his two dependant children pursuant to the Group Medical Benefits Plan or "FlexPlan" sponsored by BHI. Like other BHI employees, plaintiff made monthly employee contributions to the Medical Benefits Plan. Plaintiff's monthly contribution for family coverage under the Uniform Medical plan and the Provident Dental plan was $57.00 throughout 1991 and in January, 1992. Although plaintiff was on leave of absence from the company from January 17, 1991 to February 7, 1992, he continued to make the same $57.00 monthly contribution he made as an active employee. All other active employees who elected the same type of coverage made an identical employee contribution, regardless of the division to which they were assigned.

Following plaintiff's termination, plaintiff elected to receive continued healthcare benefits at group rates under the Consolidated Omnibus Budget Reconciliation Act (COBRA), 29 U.S.C. §§ 1161 et seq. Since plaintiff had seen the confirmation statements representing that the monthly cost for plaintiff's premium was $245.51[5], plaintiff be-

---

**3.** BHI calculates employee contributions by taking a percentage of the overall cost of the plan to BHI and dividing that amount by the number of total beneficiaries.

**4.** The court cannot find, nor did plaintiff attempt to establish, that BHI placed plaintiff in the Baker Hughes Corporate division for any improper motive.

**5.** Based on the annual confirmation statements created by BHI and sent to plaintiff, plaintiff understood the amount of BHI's monthly contribution to the plan to be $188.51 during 1991 and January, 1992. Thus, plaintiff believed the total contributions to his health coverage from his employer and himself amounted to $245.51 per month.

lieved that this would be the amount of his continuation coverage under COBRA, multiplied by 102%[6], for a total of $250.42. Continuation coverage under COBRA was important to plaintiff because, during his career, plaintiff contracted non-symptomatic Hepatitis non-A, non-B, and non-C. This pre-existing condition made health insurance coverage from private plans difficult to obtain.

Since plaintiff was aware of his need for COBRA coverage, he informed BHI of his election in December, 1991 and attempted to submit a check for $250.42 at that time. BHI did not accept this payment, and informed plaintiff that he could not elect COBRA until he experienced a qualifying event.

Plaintiff was finally terminated from BHI on February 8, 1992. On February 24, 1992, defendant's third party COBRA administrator, Johnson & Higgins/KVI, wrote plaintiff notifying him of his right to continue coverage under COBRA, and informing him that his monthly COBRA premium for family medical and dental coverage was $786.96. Plaintiff received this letter on March 12, 1992, and was shocked to learn the price of his COBRA premium. He had no indication, prior to March 12, 1992, that his COBRA premium was calculated based on the amount BHI rebilled Baker Hughes Corporate.[7]

Plaintiff continued to pay the amount of the premium quoted to him by Johnson and Higgins under protest. Beginning in May, 1992, because he could not afford the higher premium, plaintiff elected to modify his COBRA coverage to single coverage only. The total premium for single coverage was $416.63.

6. COBRA allows employers to charge up to 102% of the applicable premium to cover the costs of administering COBRA. § 1162(3).

7. In-house counsel for defendant, David Isaac, testified that he did not know of any ERISA plan documents that discuss BHI's method of calculating COBRA premiums according to the risk experience of each division.

8. Defendant's Exhibit JJ presents detailed numerical data for each division for the month of October, 1991. The information broken down

*DISCUSSION*

**I.**

### CLAIM FOR VIOLATION OF 29 U.S.C. § 1162

This case involves an issue of first impression concerning the method used to calculate COBRA premiums. The question is whether the sponsor of a single health care plan must determine the cost of COBRA continuation coverage based on the cost of coverage to the entire pool of qualified beneficiaries, or whether it may determine the cost of COBRA continuation coverage based on a subset of the entire pool.

### A. *The Cost of the COBRA Premium*

Defendant calculates COBRA premiums based on the individual loss experiences of its 30 benefits divisions. Since no two divisions have identical risk experiences, the amount BHI recovers from each division is proportional to the relative burden placed by the division on the group medical plan as a whole. Although it would be easier for BHI to calculate COBRA premiums based on the entire pool of qualified beneficiaries, BHI calculates COBRA premiums on a division by division basis. As a result, in October, 1991, for example, a COBRA beneficiary in the Wemco division, which had a low claims experience, would have to pay a monthly premium of $96.33 for single Uniform medical coverage. In contrast, a COBRA beneficiary in the Baker Hughes Corporate division, which had a high claims experience, would have to pay $317.58 for identical coverage for the same period.[8] *See* Def.'s Ex. JJ at pp. 8 & 105.

includes the claim liability rate, premium rate, the number of participants for each type of coverage, and the total cost in each of these categories. The Wemco division had 21 participants who selected single coverage under the Uniform medical plan, and a grand total premium rate of $12,003.79. During the same month, the Baker Hughes Corporate division has 119 participants who selected single coverage, and a grand total premium rate of $134,869.20. BHI rebilled the divisions for the grand total premium rate, *i.e.*, $12,003.79 for Wemco, and $134,869 for Baker Hughes Corporate.

## B. *Overview of the Statutory Scheme*

COBRA, 29 U.S.C. §§ 1161–1168, requires employers who provide group health insurance to give employees (and their dependents who were covered under the plan) who would otherwise lose health insurance due to a "qualifying event" the option to purchase continued coverage under the plan. 29 U.S.C. § 1161.[9] A "qualifying event" is an event such as death, termination, divorce or legal separation, or eligibility for benefits under title XVIII of the Social Security Act, "which, but for the continuation coverage ... would result in a loss of coverage of a qualified beneficiary." 29 U.S.C. § 1163. The scope of the continuation coverage must be "identical to the coverage provided under the plan to similarly situated beneficiaries under the plan with respect to whom a qualifying event has not occurred." 29 U.S.C. § 1162(1). If the qualifying event is termination, as in this case, the coverage must extend for 18 months after the date of termination. 29 U.S.C. § 1162(2)(A)(i).

A central feature of COBRA is that it does not require employers to pay the premium for continuation coverage. Although an employer may do so, the statute permits the employer to pass on the entire cost of continued group coverage to the qualified beneficiary. An employer's ability to require a COBRA beneficiary to pay the cost of continued group coverage is subject to certain constraints. The most important is that the COBRA premium paid by the beneficiary "shall not exceed 102 percent of the applicable premium for such period...." § 1162(3). "Applicable premium" means:

> "the cost to the plan for such period of the coverage for similarly situated beneficiaries with respect to whom a qualifying event has not occurred (without regard to whether such cost is paid by the employer or employee)."

§ 1164(1). In interpreting this provision, the court examines the language of the statute and its legislative history.

## C. *Applicable Premium*

At the outset, the court observes that in enacting COBRA Congress envisioned that the Departments of Treasury and Labor would promulgate regulations to guide plan sponsors in interpreting the statute. 29 U.S.C. § 1168. However, to date ·only the Department of the Treasury has issued proposed regulations, and these have not become final. *See* Prop.Treas.Reg. § 1.162–26, 2 Fed.Reg. 22,716 (1987); 56 Fed.Reg. 53803–03 (1991). While some courts defer to the proposed regulations, others do not. *Compare Johnson v. Reserve Life Ins. Co.,* 765 F.Supp. 1478, 1481–82 (C.D.Cal.1991) with *South Cent. United Food & Commercial Workers Unions and Employers Health and Welfare Trust v. AppleTree Markets, Inc.,* 19 F.3d 969, 973 (5th Cir.1994) ("[P]roposed regulations are entitled to no deference until final.").

The court need not decide whether to defer to the proposed regulations, since they offer no guidance on how COBRA premiums may be calculated. As of 1988, the Internal Revenue Service was reported to be working on regulations that define what is 102 percent of the "applicable premium" an employer may charge under COBRA. Thomas H. Somers, *COBRA: An Incremental Approach to National Health Insurance,* 5 J. Contemp.Health L. & Pol'y 141 note 83 (1989) (Noting that the "absence of precise statutory guidance, when coupled with the absence of long-promised cost Treasury Regulations can create an administrative nightmare for conscientious plan administrators who seek to fund COBRA coverage in accordance with the law."). Such regulations would indeed be instructive. However, almost a decade has passed since COBRA's enactment, and the promised regulatory guidelines have not materialized. "Absent executive rulemaking, it remains the duty of courts to construe the statute in order to divine congressional intent." *Appletree,* 19 F.3d at 973. Accordingly, the court consults the language of the statute, the statutory framework, and pertinent legislative history to define the "applica-

---

**9.** Section 1161(a) provides, "The plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan."

ble premium" an employer may charge for COBRA coverage. Three parts of the definition of "applicable premium" must be considered. First, the court must determine what is the "plan". Second, the court determines the meaning of "cost to the plan". Third, the court examines the meaning of "similarly situated beneficiaries".

### 1. "The plan"

Whether defendant has used an unlawful method of calculating plaintiff's COBRA premium depends, in part, on identifying the plan. COBRA defines a group health plan as "an employee welfare benefit plan providing medical care ... to participant or beneficiaries directly or through insurance, reimbursement, or otherwise." 29 U.S.C. § 1167(1). In this case, the group health plan is the plan negotiated by BHI on behalf of all of its employees and divisions and provided by Provident. Defendant's Benefits Administrator, Patricia Clemons, testified that she negotiated the insurance contract on behalf of all BHI employees. Similarly, the Baker Hughes Accounts Manager from Provident, Ms. Sweaney, testified that when she wrote up the insurance policy, she did so for BHI as a whole, and did not consider the distinct risk experiences of the various divisions.[10] Under these circumstances, the Uniform Medical Plan [11] is a single ERISA plan.

The court's finding is buttressed by ERISA's definitions of plan sponsor and employer. "Plan sponsor" means the "employer in the case of an employee benefit plan established or maintained by a single employer".[12] 29 U.S.C. § 1002(16)(B)(i). Although ERISA contains a somewhat broad definition of "employer" for general purposes,[13] it modifies that definition in the section pertaining to COBRA continuation coverage. For purposes of COBRA, the definition of "employer" set forth in section 414(t) of the Internal Revenue Code governs. § 1167(4) [14]. Section 414(t) provides that "All employees who are treated as employed by a single employer in subsection (b), (c), or (m) shall be treated as employed by a single employer for purposes of an applicable section." 26 U.S.C. § 414(t). Subsection (b) states, "For purposes of sections 401, 408(k), 410, 411, 415, and 416, all employees of all corporations which are members of a controlled group of corporations ... shall be treated as employed by a single employer." 26 U.S.C. § 414(b). A "controlled group of corporations" includes a parent-subsidiary, that is, "one or more chains of corporations connected through stock ownership with a common parent." 26 U.S.C. § 1563(a)(1).

■ Applying these statutory definitions, the employer for COBRA purposes is BHI, and not a division of BHI. Likewise, the

---

**10.** Had BHI chosen to do so, it could have required its divisions to contract with Provident individually. Under the proposed Treasury regulations, which have not become final, if each division entered into a separate insurance contract, each contract would be treated as a separate plan, even if the contracts were identical and negotiated as part of a single arrangement. Prop.Treas.Reg. § 1.162–26 Q & A–10(e); Roberta Casper Watson, *COBRA Health Continuation Benefits*, C940 ALI–ABA 25, 103 (1994). In this case, several divisions of a large employer, some of them separately incorporated, provide insurance to their employees under one contract—the contract negotiated by BHI on behalf of all 11,500 BHI employees. Under the proposed regulations, when several divisions provide insurance to their employees under the same contract, the contract would be treated as a single plan. *Id.*

**11.** Provident offers two medical plans to BHI employees, the Uniform plan and the Basic plan.

**12.** "Plan sponsor" may also mean the "the employee organization in the case of a plan established or maintained by an employee organiza-

tion" or "in the case of a plan established or maintained by two or more employers ... [the] group of representatives of the parties who establish or maintain the plan." 29 U.S.C. § 1002(16)(B).

**13.** Under ERISA, an employer refers to "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to any employee benefit plan...." 29 U.S.C. § 1002(5).

**14.** "Subsection (n) (relating to leased employees) and subsection (t) (relating to application of controlled group rules to certain employee benefits) of section 414 of Title 26 shall apply for purposes of this part in the same manner and to the same extent as such subsections apply for purposes of section 106 of such title." 29 U.S.C. § 1167(4). 26 U.S.C. § 106 excludes employer-provided health coverage from the gross income of an employee.

"plan sponsor" is BHI, and not a division of BHI. Ms. Clemons testified that BHI was the plan sponsor for the ERISA plan offered by BHI. Moreover, BHI identified itself as the "plan sponsor", "employer" and "plan administrator" on Internal Revenue Service (IRS) Form 5500.

Under COBRA, it is the "plan sponsor of each group health plan" who "shall provide" continuation coverage to qualified beneficiaries. 29 U.S.C. § 1161(a). Therefore, it is incongruous with the language of the statute to treat separate divisions of BHI as the employer or plan sponsor. For COBRA purposes, the employees of the various divisions BHI should be treated as employed by a single employer.

### 2. "Cost to the Plan"

■ COBRA defines "applicable premium" as "the cost to the plan", not the cost to the employer. § 1164(1). Thus, the plain language of the statute supports the court's conclusion that the "cost to the plan" is the net cost of insuring all of BHI's employees, not the average cost of insuring a subset of BHI employees. Accordingly, the cost that the employer may pass on to the COBRA continuee must be determined with reference to the net cost of the entire medical plan. In other words, a COBRA premium must equal the total cost of a plan divided among all beneficiaries, and not a subset of those beneficiaries.

Commentators reviewing this definition have stressed that "the cost of the premium is not defined with regard to the cost of the employer but rather with regard to the cost of the plan." Watson, *supra,* at 90; Jonathan W. Harris, *Health Benefit Continuation Coverage Under COBRA,* 5 Oct. Prob. & Prop. 11 (1991) ("The 'applicable premium' is the plan's cost for a period of coverage. For a fully insured plan, the applicable premium is the employer's cost as determined by the insurer."). Accordingly, "the employer can only charge the net cost of providing the coverage (the premium less experience rebates and dividends). Watson, *supra* at 90.

"The amount to be charged for the continuation coverage thus must be based on the ultimate net cost to the employer (i.e. the premium cost less any dividends or experience rebates)." Somers, *supra* at note 89, *quoting* Morgan, *Continuation of Health Care Coverage,* 31 Tax Notes 1247, 1255 (1986).

■ This interpretation is also congruous with COBRA's statutory scheme. Although COBRA allows employers to pass on some or all of the cost of continuation coverage to COBRA beneficiaries, § 1162(3) caps the total premium which may be charged at 102 percent of the applicable premium, and allows the beneficiary to make payments in monthly installments. Both of these limitations evince Congress' intent to ensure that individuals who experience qualifying events have continued access to health insurance at attainable rates. In addition, COBRA "coverage may not be conditioned upon, or discriminate on the basis of lack of, evidence of insurability." § 1162(4). It is thus reasonable to assume that Congress was aware that poor-risk COBRA beneficiaries would avail themselves of COBRA coverage, while good risks could seek private health insurance elsewhere.[15] Finally, § 1162(1) requires the plan sponsor to offer "identical" coverage to the COBRA beneficiaries as is provided to other similarly situated beneficiaries under the plan who have not experienced a qualifying event. Interpreting this provision, the Fifth Circuit concluded that "the intent of Congress was to prohibit sponsors from discriminating between COBRA qualified beneficiaries and active employees who are participating in the same plan." *AppleTree,* 19 F.3d at 976. The court concludes from these provisions, that Congress intended to restrict the cost of COBRA premiums, and prevent COBRA beneficiaries from being treated differently than active employees. A method of calculating COBRA premiums that subverts these goals violates COBRA.

---

15. COBRA continuees appear to be a self-selecting group, and consequently pose a heavier burden on the group medical plan than average beneficiaries. According to a study by the Employee Benefits Research Institute, the average cost for COBRA continuation coverage in plan year 1991 was $1.93 per $1.00 of claims for active employees. *Employer's COBRA Costs,* EBRI Notes Nov. 1992.

This interpretation is also supported by COBRA's legislative history. It reveals Congress' intent to have employees who experienced a qualifying event to continue to reap the benefits of risk spreading. Congress enacted COBRA in response to "reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay" and in "an effort to provide continued access to affordable private health insurance to some of these individuals". H.R.Rep. No. 241, 99th Cong., 2d Sess. 44, reprinted in 1986 U.S.C.C.A.N. 42, at 622. The Senate Report accompanying the bill registered the committee's concern that "certain spouses and dependent children may be deprived of health benefits due to an unexpected change in family status". S.Rep. No. 146, 99th Cong., 2d Sess. 363, reprinted in 1986 U.S.C.C.A.N. at 322. Both the House and the Senate Reports described the bills as extensions of health insurance coverage at "group rates." 1986 U.S.C.C.A.N. at 321, 622.

■ In addition, the House Report specifically addressed how the cost of continuing coverage would be borne. It stated:

> The qualified beneficiary would be required to pay both the employer and employee shares of the premium costs, although the employer could assume the employer share if it wanted to . . . . The total premium charged by a group health plan for the continuation coverage would not exceed the sum of the employer and employee premiums generally charged to similarly situated beneficiaries. In order to protect the group plan from any increased costs due to the continuation of individuals under this bill, the total of all premiums charged by the plan in any plan year may be based upon reasonably anticipated community costs for such plan year *of the entire pool of insured employees* and other qualified beneficiaries under the plan, including persons receiving continuing coverage. [Emphasis added.]

*Id.* at 623. The purpose of COBRA is "to afford employees who lose their jobs in a potential layoff continuation medical coverage at approximately the group rate, which is of course lower than the rate for individual coverage." *Local 217, Hotel & Restaurant Employees Union v. MHM, Inc.,* 976 F.2d 805, 809 (2nd Cir.1992); *see also* Leslie Pickering Francis *Consumer Expectations: Consumer Expectations and Access to Healthcare,* 140 U.Pa.L.Rev. 1881, 1911, (1992) ("The idea of COBRA is to allow discharged employees to receive insurance more cheaply, because they continue to participate in the risk pool of their employer's group plan.").

■ The court concludes that the applicable premium must be determined with reference to the average cost of all beneficiaries of the plan. Ms. Sweaney testified that Provident computes the cost of insurance coverage for all BHI employees, not a subdivision of employees. Provident used an 11 step process that treated all BHI employees the same for the purpose of determining the rates. Pursuant to BHI's instructions, Provident then takes these calculations a step further, and determines the average cost of coverage on a division by division basis. BHI requests Provident to provide it with a division by division breakdown, so that BHI may rebill each division for their share of the group medical coverage. While this method may be used for BHI's internal accounting purposes, it may not be used to determine the cost of premiums for COBRA continuees. The cost of plaintiff's coverage to the plan was the same as the cost charged active employees receiving identical coverage, grossed up by 102 percent. That cost was $250.42.

### 3. "Similarly Situated Beneficiaries"

■ Section 1164 defines the applicable premium as "the cost to the plan . . . for similarly situated beneficiaries" who have not experienced a qualifying event "without regard to whether such cost is paid by the employer or employee." § 1164(1). Although the statute does not define "similarly situated beneficiaries," the Conference Report accompanying the bill sheds light on its meaning. That Report states:

> In general, similarly situated individuals are those individuals defined by the plan (consistent with Treasury regulations) to be similarly situated and with respect to which no qualifying event has occurred.

The Secretary of the Treasury is to define similarly situated individuals by taking into account the plan under which the coverage is provided (e.g. high or low option), the type of coverage (single or family) and, if appropriate, regional differences in health costs.

H.Conf.Rep. No. 453, 99th Cong., 2nd Sess. 565–566. The Report also identified two factors which would be impermissible for a plan to consider. A plan may not define "similarly situated" with reference to classifications that would violate Title VII of the Equal Pay Act (*e.g.*, race, sex). *Id.* Likewise, a plan may not define "similarly situated" to mean medically identical. *Id.*

■ "Similarly situated beneficiaries" appears to refer to a subset of beneficiaries who are covered under the same plan as the COBRA continuee, and who have elected the same policy and level of coverage as the COBRA continuee. By including "similarly situated" in the definition of "applicable premium" Congress evinced its intent that the applicable premium charged to COBRA continuees would be identical to the premium for active employees under the same plan. In so doing, Congress ensured that a COBRA premium would be calculated with reference to the premium of the similarly situated group, for example, the group of insureds in Southern California as opposed to those in Northern California, or any other group for which the plan sponsor negotiated a premium. Here defendant did not negotiate a different rate for different divisions. Thus, the issue of "similarly situated" is not determinative in this case.

### D. *Conclusion*

The court finds that defendant has a legitimate business interest in rebilling its divisions based on the expenses incurred by that division. According to testimony adduced at trial, BHI's philosophy is that each division should bear its own costs. The court further finds that BHI has used this division by division method of calculating COBRA premiums for several years, and it did not selectively apply this method to plaintiff. *See* Def.'s Ex. JJ.

Whatever its intentions, defendant's method of calculating COBRA premiums creates wide variances in the amounts paid for iden-

tical COBRA coverage by employees from different divisions. Moreover, in the aggregate, this practice places a heavier burden on COBRA beneficiaries and a lesser burden on BHI and its active employees. The real world events that cause a particular division's claims experience to increase, *e.g.*, illness or age, will tend to lead to qualifying events, *e.g.*, termination due to illness or death. Defendant's expert witness, Kenneth Ruthenburg, testified that it is a reasonable assumption that in divisions with higher claims experience there will also be a higher incidence of qualifying events, and therefore, calculating COBRA premiums on a division by division basis will result in a higher sum total of COBRA premiums than averaging throughout the corporation as a whole. While there may be sound business reasons for BHI to require divisions to account for their cost to BHI for the group health plan, it does not follow that an individual's COBRA premium may be determined by that individual's association with a particular division.

■ Defendant's method of calculating COBRA premiums on a division by division basis is incongruous with the language, structure and purpose of the statute. Accordingly, the court concludes that defendant's method of calculating the cost of plaintiff's COBRA premiums violated §§ 1162–1164.

### II.

### MONETARY DAMAGES UNDER § 1132

Plaintiff's second claim is that defendant refused to supply the summary plan description (SPD), as required by 29 U.S.C. §§ 1022(a) and 1024(b)(1) & (4), and that this violation has triggered liability under 29 U.S.C. § 1132(c). Section 1022(a) provides:

A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title.

§ 1022(a). Section 1024(b)(4) provides:

The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust

agreement, contract, or other instruments under which the plan is established or operated.

§ 1024(b)(4).

Section 1132(c)(1) provides in relevant part:

"Any administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary ... by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper." 29 U.S.C. § 1132(c)(1).

■ ERISA expressly commits the decision to assess penalties for failure to provide requested information to the sound discretion of the trial court. § 1132(*l*); *Paris v. F. Korbel & Bros., Inc.,* 751 F.Supp. 834, 839 (N.D.Cal.1990). The *Paris* court surveyed the factors considered by other courts' interpretations in exercising their discretion under § 1132(c).[16]

■ The first factor is prejudice to the plaintiff. The *Paris* court found a split of authority as to whether prejudice to plaintiff should be a factor in awarding penalties, and concluded that the better rule was to assess penalties even though a plaintiff could not show prejudice. The court reasoned that the "purpose of the penalty was to punish poor benefit plan administrators, not to compensate the employees." *Id. citing Porcellini v. Strassheim Printing Co.,* 578 F.Supp. 605, 612 (E.D.Pa.1983). The court also ruled that an employer's good faith, and lack of actual harm to a beneficiary may be mitigating factors. *Paris,* 751 F.Supp. at 840. This court will consider whether to assess penalties in view of the *Paris* court's focus on the conduct of the defendant.

According to testimony of Ms. Clemons, her first contact with plaintiff's counsel, William Murphy, was by phone, before she received his written letter of August 4, 1992. During that conversation, Ms. Clemons explained that BHI did not use a different method for calculating insurance premiums for active employees than the method it used for calculating COBRA continuation insurance premiums, in that both were calculated on a division by division basis. Ms. Clemons testified to her belief that Mr. Murphy understood, and that he did not ask for any plan documents at this time.

On August 4, 1992, Mr. Murphy wrote Ms. Clemons, stating:

Mr. Draper continues to have questions as to the appropriate computation of his COBRA premium. Accordingly, would you please forward to me a copy of the ERISA Plan pursuant to which the COBRA premium for Mr. Draper was computed. I am especially interested in the Plan provisions dealing with what I understand to be the switch in computation of premiums from a "blended rate" based on all Baker–Hughes divisions (the premium charged during employment) and the experience-rated premium based on the division which employed the terminated individual (apparently, the premium used to compute the COBRA premium).

Pl.Ex. 1. Having received no response to this letter, plaintiff's counsel sent a second letter to Ms. Clemons on September 2, 1992. Pl.Ex. 2. This letter makes a reference to the August 4, 1992 request for information, and asks Ms. Clemons to respond. According to Ms. Clemons' testimony, she did not respond to his August 4, 1992 letter because there where no documents authorizing the switching of calculation methods, which is what she believed Mr. Murphy was requesting. Ms. Clemons also testified to a phone conversation with Mr. Murphy sometime in September 1992. During this conversation, Ms. Clemons tried to explain the method BHI used to calculate plaintiff's COBRA pre-

---

**16.** In *Paris,* it was undisputed that the employer failed to provide information upon request, and failed to give notice of plaintiff's termination to the plan administrator. In assessing penalties under 29 U.S.C. § 1132, the court considered these violations separately. As to the failure to provide information, the court ordered the employer's Vice President for Administration/Finance to pay penalties of $10 per day for the period of violation, approximately three months.

miums, and she believed Mr. Murphy was satisfied with her explanation.

Mr. Murphy's "request" of August 4, 1992, and the two follow-up letters, failed to clearly convey his request for the ERISA plan documents. Plaintiff's August 4, 1992 letter indeed requests "a copy of the ERISA Plan". However, the next sentence modifies this request by explaining that he was "especially interested in the Plan provisions dealing with ... the switch in computation of premiums". Pl.Ex. 1. As Ms. Clemons testified, there was no such provision. The letters appear to have been crafted in part to convey to Ms. Clemons plaintiff's belief that defendant lacked the authority to calculate his COBRA premiums on a division by division basis.

An exchange of letters ensued in October, 1992. These letters do not support plaintiff's position that he made repeated document requests, which were ignored by defendant. Rather, they simply show that the parties appeared to have misunderstood each other all along. On October 1, 1992, Mr. Murphy wrote Ms. Clemons, stating, "When we spoke by telephone on September 18, 1992, you assured me that you would provide to me 'next week' the information Mr. Draper has been requesting since August 4, 1992, concerning the variance in insurance rates for COBRA beneficiaries.... I must remind you of your firm's obligations under ERISA to provide such information...." Pl.Ex. 3. On October 5, 1992, Ms. Clemons wrote Mr. Murphy a four-point explanation of how BHI calculated plaintiff's COBRA premiums, but did not enclose any plan documents. Pl.Ex. 4. In his October 7, 1992 letter to Ms. Clemons, Mr. Murphy explained that he understood after his initial contact with her how BHI calculated plaintiff's COBRA premiums, but that his request "was to see the *actual Plan provisions* which purport to authorize the switch in computation of insurance premiums when an individual elects COBRA coverage." Pl.Ex. 5. After receiving this letter, Ms. Clemons determined that she was unable to communicate effectively with Mr. Murphy, so she turned over the correspondence to Mr. Isaac, BHI's in-house ERISA attorney. In a letter to Mr. Murphy dated October 23, 1992, Mr. Isaac tried to clear up the misunderstanding about the computation of plaintiff's COBRA premium, and explained that BHI had not switched plaintiff's premium contribution after his termination. Pl. Ex. 6. This letter did not enclose copies of the ERISA plan. However, according to Mr. Isaac's testimony, he did not understand Mr. Murphy to be requesting an SPD, but rather a plan provision authorizing premium switching which did not exist.

On December 2, 1992, Mr. Murphy wrote Mr. Isaac, explaining that he still had not been provided with the actual Plan provisions which purport to authorize the computation of insurance premiums when an individual elects COBRA coverage, and that he "would also like to see the Summary Plan Description." Pl.Ex. 7. Mr. Isaac testified that he understood Murphy's December 1992 letter to be a request for an SPD. Accordingly, on January 4, 1993, Mr. Isaac sent Mr. Murphy the SPD for the group medical benefits plan, along with a Schedule of Premium Rates calculated by Provident. Pl.Ex. 8. Apparently, Mr. Isaac's letter did not satisfy Mr. Murphy, whose February 1, 1993 response to Mr. Isaac enlarged his original information request. That letter "again request[ed] ... a complete copy of the Baker Hughes Incorporated Group Medical Benefits Plan ("Plan"), including Group Policy No. M–313 issued by ... Provident ... and any other insurance contracts under which the Plan is maintained." Pl.Ex. 9.

In a clear attempt to comply with the new request, Mr. Isaac sent Mr. Murphy a copy of the BHI's application for group medical, dental, and life insurance with Provident; a letter of understanding between BHI and Provident; the contract between BHI and Provident; and billing information reflecting premiums paid by BHI to Provident. Pl.Ex. 10. Plaintiff did not show that he made any additional document requests which were ignored by defendant.

On December 23, 1993, defendant sent Mr. Murphy documents requested in discovery, including a copy of the "Baker Hughes Incorporated Employee Benefit Plans" and a copy of the 1992 "Material Modifications" update to that booklet. Plaintiff argues that it was not until he received these items that his initial document request was satisfied. That is not the case. Plaintiff did not clearly

request an SPD until December 1992, and defendant complied with that request in January 1993. At worst, Mr. Isaac's response in January 1993 to plaintiff's request for the SPD was incomplete in that Mr. Isaac enclosed the medical SPD only, and failed to enclose the dental SPD and the 1992 material modifications. Despite this oversight, Mr. Murphy did not reiterate the request in his response of February 1, 1993. Moreover, as the exchange of letters demonstrates, when Mr. Murphy made a clear request for documents, defendants responded in good faith by sending him documents it believed would satisfy that request.

■■■■ While plaintiff's voluminous letters indicate that defendant may have inadvertently violated § 1132 of ERISA, defendant's conduct was not so egregious as to warrant penalties. Plaintiff's information requests were ambiguous. Once it was unambiguously communicated that plaintiff was requesting the SPD's, defendant attempted to satisfy that request. Defendant's good faith "may be a mitigating factor" in determining the amount of penalties to assess. *Paris v. F. Korbel & Bros., Inc.*, 751 F.Supp. 834, 840 (N.D.Cal.1990). Accordingly, the court will not exercise its discretion to impose penalties on defendant under § 1132.

## III.

## CLAIM FOR BREACH OF FIDUCIARY DUTIES

■■■■ Plaintiff claims that defendant breached its fiduciary duty to disclose information in violation of 29 U.S.C. §§ 1104(a) and 1109. Defendant moved for judgment as a matter of law, arguing that plaintiff had no right of action under these statutes since he does not seek to recover for the benefit of the plan as a whole, but simply seeks money damages for himself.

In *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 142, 105 S.Ct. 3085, 3090, 87 L.Ed.2d 96 (1985), the Supreme Court interpreted § 1109 to preclude claims unless they inure to the benefit of the plan as a whole. Similarly, the bar to private actions under § 1109 in *Russell* has been applied to claims under § 1104. In *McLeod v. Oregon Lithoprint Inc.*, 46 F.3d 956 (9th Cir.1995), the Ninth Circuit held that an individual

could not recover money damages under § 1104 for breach of fiduciary duty where she did not seek to recover for the plan as a whole.

Although counsel for plaintiff has attempted to characterize the relief sought as "equitable," it is apparent to the court that plaintiff seeks monetary compensation for an individual beneficiary. *See McLeod,* 46 F.3d at 958–60 (Affirming summary judgment for defendant on plaintiff's § 1104 claim on the grounds that plaintiff could not recover unreimbursed expenses characterized as "equitable or remedial"). Accordingly, defendant's motion for judgment as to plaintiff's claims under §§ 1104 and 1109 will be granted.

## IV.

## ATTORNEY'S FEES AND COSTS

■■■■ Both parties have requested attorney's fees and costs. While the usual rule is that both parties will bear their own costs, ERISA has modified that rule. Section 1132(g)(1) of ERISA provides, in relevant part: "In any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The Ninth Circuit has established a five factor test to determine whether to award attorneys' fees under this statute. *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 388 (9th Cir.1994); *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 453 (9th Cir. 1980). These factors include:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

*Id.*

■■■■ With respect to the first factor, bad faith, the court finds that BHI decided to

calculate COBRA premiums on a division by division basis for business reasons, and as a consequence of its corporate philosophy that each division must account for its expenses. With respect to the second and third factors, the court finds that defendant could satisfy an award of attorney fees, and that an award would deter others from calculating COBRA premiums in violation of the statute. With respect to the fourth factor, while plaintiff brought this action as an individual, and did not seek to benefit all beneficiaries of defendant's ERISA plan, he nonetheless sought to resolve a significant legal question regarding the calculation of COBRA premiums. Finally, plaintiff's position is meritorious. For these reasons, the court finds that plaintiff is entitled to attorney's fees and costs. Plaintiff's request for attorney's fees and costs will therefore be granted, and defendant's request will be denied.

The court concludes that defendant charged plaintiff a COBRA premium in excess of the amount allowed by statute in violation of 29 U.S.C. § 1162. Accordingly, plaintiff is entitled to judgment for the difference between what he was charged per month by defendant for coverage for himself and his two dependents under the group medical and dental plan and what he should have paid per month for that coverage, multiplied by the 18 months for which he was entitled to COBRA benefits. That amount is $786.96 less $250.42 times 18, or $9,657.72, plus prejudgment interest at the legal rate. The court will not impose statutory penalties under 29 U.S.C. § 1132 on defendant for its failure to furnish information to plaintiff. Defendant's motion for judgment on plaintiff's claims for breach of fiduciary duty under 29 U.S.C. §§ 1104 and 1109 is granted. Plaintiff is entitled to reasonable attorney's fees and costs under ERISA § 503(g)(1), 29 U.S.C. § 1132(g)(1). Counsel for plaintiff is instructed to comply with Local Rule 293 in making his application for attorney's fees and costs.

LET JUDGMENT BE ENTERED ACCORDINGLY.